UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE MANUEL ARIZMENDI DE PAZ,<br><br>Petitioner,<br><br>v.<br><br>CHAD T. WOLF, Acting Secretary of Homeland Security; et al.,<br><br>Respondents. | Case No.: 20-cv-955-WQH-BGS<br><br>**ORDER** |

HAYES, Judge:

The matters before the Court are 1) the Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 filed by Petitioner Jose Manuel Arizmendi de Paz (ECF No. 1); 2) the Motion for Temporary Restraining Order filed by Petitioner Jose Manuel Arizmendi de Paz (ECF No. 3); and 3) the Motions to File Documents Under Seal filed by Respondents (ECF Nos. 5, 13).

## I. PROCEDURAL BACKGROUND

On May 22, 2020, Petitioner Jose Manuel Arizmendi de Paz filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241. (ECF No. 1). Petitioner alleges that he is an immigration detainee at the Otay Mesa Detention Center ("OMDC") "awaiting resolution of his withholding-only removal proceeding . . . ." (*Id.* ¶ 9). Petitioner alleges that his continued detention violates his substantive due process rights due to

"Respondents' inaction on COVID-19 and the increasing chaos at [OMDC]." (*Id.* ¶ 8). Petitioner "requests that this Court order his immediate release . . . ." (*Id.*).

On May 26, 2020, Petitioner filed a Motion for Temporary Restraining Order. (ECF No. 3). Petitioner requests "that this Court intervene and order his immediate release from [OMDC] to his committed sponsor" so Petitioner can have "the best chance of surviving his [COVID-19] infection and recovering fully." (*Id.* at 8).

On June 1, 2020, Respondents filed a Return to Petition for Writ of Habeas Corpus and Response in Opposition to Motion for Temporary Restraining Order. (ECF No. 7). On the same day, Respondents filed a Motion to File Documents Under Seal. (ECF No. 8). On June 4, 2020, Petitioner filed an Omnibus Reply in Support of Petition for Writ of Habeas Corpus and Motion for Temporary Restraining Order. (ECF No. 10).

On June 11, 2020, Respondents filed a Supplemental Response (ECF No. 12) and a second Motion to File Documents Under Seal (ECF No. 13). On June 17, 2020, Petitioner filed a Supplemental Reply. (ECF No. 16).

## II. FACTS

### a. Petitioner's Immigration History

Petitioner is a 36-year old citizen of Mexico. Petitioner "arrived in the United States at or near San Ysidro, California, on or about May 6, 1999" and was "not then admitted or paroled after inspection by an Immigration Officer." (U.S. Department of Homeland Security ("DHS") Notice to Appear, ECF No. 7-1 at 2). On April 15, 2008, an immigration judge ordered Petitioner removed to Mexico pursuant to a stipulated Order of Removal. (*See* Order of Removal, ECF No. 7-1 at 4). Petitioner was subsequently found in the United States by immigration officials and removed to Mexico on April 4, 2011; April 21, 2011; May 21, 2011; June 1, 2018; September 6, 2018; and September 13, 2018.

On October 19, 2018, Petitioner was apprehended near the Tecate Port of Entry, where he claimed a fear of persecution or torture upon returning to Mexico. Petitioner was issued a Notice of Intent/Decision to reinstate his 2008 Order of Removal (*See* Notice of Intent/Decision to Reinstate Prior Order, ECF No. 7-1 at 8) and was arrested on criminal

immigration charges. On October 30, 2018, Petitioner was released from federal custody in the criminal case on a $1,000 bond. (*See* Docket No. 11, *United States v. Arizmendi-Depaz*, No. 18-cr-4949-BGS (S.D. Cal.), ECF No. 7-1 at 11).

On December 16, 2019, Petitioner applied for a "U" (non-immigrant status) visa. (*See* Notice of Action, Ex. A, Decl. of John S. Tschirgi in Support of Pet. for Writ of Habeas Corpus ("Tschirgi Decl."), ECF No. 1-4 at 14). Petitioner's visa application is pending.

On February 18, 2020, the Court dismissed the federal criminal immigration charges against Petitioner on the government's motion. (*See* Docket No. 58, *United States v. Arizmendi-Depaz*, No. 18-cr-4949-BGS (S.D. Cal.), ECF No. 7-1 at 9, 16). Petitioner was taken into DHS custody pending reinstatement proceedings for the 2008 Order of Removal. On February 26, 2020, Petitioner was transferred to OMDC.

On March 13, 2020, Petitioner attended a telephonic reasonable fear interview with an asylum officer. The asylum officer determined that Petitioner was credible and that he established a reasonable fear of torture or persecution if removed to Mexico. (*See* Reasonable Fear Finding, ECF No. 7-1 at 27, 35). On March 20, 2020, Petitioner was referred to an immigration judge for a hearing. (*See* Notice of Referral to Immigration Judge, ECF No. 7-1 at 37). Petitioner's first hearing before the immigration judge was held on April 10, 2020. Petitioner has an upcoming hearing on July 10, 2020.

On April 13, 2020, Petitioner filed an Application for Discretionary Release with U.S. Immigration and Customs Enforcement ("ICE"). (*See* Appl. for Discretionary Release, Ex. A, Tschirgi Decl., ECF No. 1-4 at 2). On May 13, 2020, ICE denied the Application, stating that "[t]here is no appeal from this decision." (*See* May 13 Denial Letter, Ex. B, Tschirgi Decl., ECF No. 1-5 at 2; *see also* May 29 Denial Letter, ECF No. 7-1 at 39 ("[Petitioner] has demonstrated a flagrant disregard for U.S. Immigration laws and is considered a significant flight risk. Therefore, [the] application for discretionary release is denied. There is no appeal from this decision.")).

///

///

### b. Petitioner's Medical Treatment

On February 26, 2020, Petitioner was seen by a registered nurse for an OMDC intake screening. Petitioner complained of mild, intermittent chest pain from a fall at his previous detention facility but denied having "any current or past medical problems." (ICE Health Services Corps ("IHSC") Medical Rs., ECF No. 6-1 at 145). Petitioner received a chest x-ray, which returned normal, and was medically cleared for custody. (*Id.* at 148).

On February 27, 2020, Petitioner was seen by a registered nurse for rib and back pain from the fall at his previous detention facility. Petitioner told the nurse that he had a thirteen-year history of sciatica, and the nurse prescribed pain medication and instructed Plaintiff on pain management techniques. (*Id.* at 142-43). On February 28, 2020, Petitioner attended a follow-up appointment. Petitioner told the nurse practitioner that he had a ten-year history of sciatic back pain and "reflux disease." (*Id.* at 139). The nurse diagnosed Petitioner with "[g]astro-esophageal reflux disease" ("GERD") and prescribed Petitioner pain medication to treat back pain and omeprazole to treat GERD. (*Id.*).

On March 3, 2020, Petitioner was seen by a registered nurse for his initial physical exam at OMDC. When asked about his medical history, Petitioner denied having any chronic medical condition, asthma, or diabetes. (*See id.* at 135 ("Do you have Asthma? *Denies*;" "Do you have Diabetes? *Denies*;" "Do you have a chronic medical condition? *No*.")). On March 13, 2020, Petitioner was transferred to the Adelanto ICE Processing Center. On March 18, 2020, Petitioner was transferred back to OMDC.

On March 19, 2020, Petitioner was examined by a registered nurse for an OMDC intake screening and by a nurse practitioner for a physical exam. When asked if he had "any current or past medical problems," Petitioner stated that he had GERD for thirteen years. (*Id.* at 117). Petitioner denied having asthma or diabetes. (*Id.* at 121). Petitioner was screened for COVID-19 symptoms due to "[c]ontact with and (suspected) exposure to [COVID-19]." (*Id.* at 111). Petitioner denied having any symptoms of COVID-19 but agreed to be placed in "isolation" in the Medical Housing Unit ("MHU"). (*Id.* at 112). Between March 19, 2020, and March 25, 2020, Petitioner received nursing checks and vital

signs measurements daily. On March 25, 2020, Petitioner reported "feeling good" with no symptoms of COVID-19 and was advised to return to "sick call" if he experienced symptoms. (*Id.* at 64-65). On March 29, 2020, Petitioner was discharged from the MHU.

On April 9, 2020, Petitioner attended a telephonic appointment with a registered nurse requesting "a healthy diet" because Petitioner was "recently told he was 'pre-diabetes.'" (*Id.* at 28). Petitioner was prescribed a "[d]iet for [h]ealth" on April 10, 2020. (*Id.* at 5). Between March 29, 2020, and April 23, 2020, Petitioner received medical care unrelated to COVID-19 on seven occasions. On May 19, 2020, Petitioner attended an appointment with a registered nurse, presenting with fatigue and a dry cough for six days and occasional back pain and coughing. The nurse prescribed Petitioner an expectorant, advised Petitioner to increase rest and to drink warm fluids, and ordered a COVID-19 test. (*Id.* at 12-13). The nurse advised Petitioner to return to sick call if he experienced worsening of symptoms, fever, or difficulty breathing before his next appointment.

Petitioner states in his Declaration that "[o]n May 24, [he] was told [he] had tested positive for COVID[-]19" and was "moved to K-Pod and put in a room with six other people." (Supp. Decl. of Pet'r Jose Manuel Arizmendi de Paz ("Pet's Supp. Decl."), ECF No. 10-3 ¶ 4). Between May 25, 2020, and June 8, 2020, Petitioner received nursing checks and vital signs measurements daily. Between May 25, 2020, and June 2, 2020, the only symptoms of COVID-19 that Petitioner reported were headache and two incidents of trouble breathing at night. Petitioner was advised to return to sick call if his symptoms worsened. On June 3, 2020, the nurse practitioner noted that Petitioner "would possibly meet requirements to be released from isolation and would be considered non-infectious to others;" however Petitioner reported that he had a "rebound feeling of symptoms" including sore throat, shortness of breath, trouble breathing, chest pain or pressure, and sinus pressure. (IHSC Medical Rs., ECF No. 14-1 at 34). The nurse determined that Petitioner would "remain a few more days on isolation" and prescribed an albuterol inhaler. (*Id.*).

On June 5, 2020, Petitioner reported to the nurse practitioner that he continued to experience symptoms of COVID-19 but had seen "some improvement" from using the inhaler. (*Id.* at 26). Petitioner told the nurse that he had been "told he was prediabetic." (*Id.*). On June 8, 2020, the nurse practitioner noted that Petitioner's symptoms of COVID-19 were "persisting" but not "worsen[ing]." (*Id.* at 18). The nurse noted that Petitioner would be moved to the MHU for monitoring and advised Petitioner to return to sick call if his symptoms worsened.

Between February 26, 2020, and June 8, 2020, Petitioner received medical services at OMDC from IHSC medical providers eighty-nine times. Petitioner's vital signs, including his temperature, blood pressure, and oxygen saturation percentage were checked thirty-one times. Petitioner was weighed eighteen times and was educated on healthy weight, diet, and exercise six times. (*See generally*, IHSC Medical Rs., ECF Nos. 6-1, 14-1). Petitioner states in his Declaration that "[a]round early 2019, [he] was diagnosed as being pre-diabetic." (Decl. of Pet'r Jose Manuel Arizmendi de Paz ("Pet's Decl."), ECF No. 1-2 ¶ 12). Petitioner submits a February 16, 2019, medical record from St. Leo Medical Office in which Petitioner's medical provider noted, "? prediabetes." (St. Leo Medical Office Progress Notes, Ex. 1, Decl. of John S. Tschirgi in Support of Reply, ECF No. 10-2 at 6). Dr. Daren R. Mealer, the Western Regional Clinical Director for IHSC, states in his Declaration that on June 10, 2020, Petitioner underwent a blood test that "suggests a diagnosis of prediabetes . . . and confirms absence of known diabetes." (Decl. of Dr. Daren R. Mealer, ECF No. 12-1 ¶ 23). Petitioner states in his Declaration that he "ha[s] not been formally diagnosed with asthma." (Pet's Decl., ECF No. 1-2 ¶ 17).

### c. Conditions at OMDC

"As of May 14, 2020, [OMDC] was operating at 41.6% capacity," with a total of 540 ICE detainees present on site. (Third Decl. of Warden C. LaRose ("LaRose Decl."), ECF No. 7-2 ¶ 9). Most OMDC housing pods "remain under cohort/quarantine status." (*Id.* ¶ 66). There is a "significantly low occupancy rate at OMDC overall and in the ICE housing pods . . . ." (*Id.* ¶ 44). "Detainees in general population housing pods are permitted free

access to their cells and the dayroom" during certain hours. (*Id.*). "[D]etainees who do not wish to be around other detainees may . . . spend time either in their cells or in ample free space in the dayrooms or in the open recreation enclosures." (*Id.* ¶ 45).

"All detainees have been offered surgical masks to wear in the housing units to prevent the spread of droplet infection." (Decl. of Sheri W. Malakhova, MD ("Malachova Decl."), ECF No. 7-4 ¶ 24). Masks were offered to detainees on April 10, 2020; April 24, 2020; and May 11, 2020. "OMDC detainees [are] provided . . . facial masks at no cost to the detainees." (LaRose Decl., ECF No. 7-2 ¶ 74). "Detainee movement at OMDC has been significantly limited to reduce COVID-19 exposure. In the event a detainee from a protective cohort or quarantine unit must be moved throughout the facility, he is requested to wear a facial mask." (*Id.* ¶ 65). "[I]f a detainee asks unit staff for a new mask because his/her mask is soiled or no longer usable, detainees are provided with new masks." (*Id.* ¶ 76). "[S]taff are required to at a minimum, wear facial masks, eye protection and gloves when entering a housing pod." (*Id.* ¶ 49).

"Housing units are cleaned throughout the day and showers are cleaned two-three times a day." (Malachova Decl., ECF No. 7-4 ¶ 26; *See* LaRose Decl., ECF No. 7-2 ¶ 51). "ICE stocks and distributes soap and sanitation supplies within detainee units so that detainees can maintain personal hygiene and perform additional sanitation of tables, telephones, tablets and other high contact surfaces with every use . . . ." (Malachova Decl., ECF No. 7-4 ¶ 36). OMDC provides detainees with bar soap and with liquid soap in communal restroom areas. Hygiene items are provided "to detainees twice a week with no restriction on obtaining bar soap." (LaRose Decl., ECF No. 7-2 ¶ 94).

"IHSC has [ ] rescheduled outside elective medical appointments . . . ." (Malachova Decl., ECF No. 7-4 ¶ 28). "ICE has enacted prohibitions on social visitation and facility tours and . . . [p]rofessional visits have been made noncontact visits in order to prevent outsiders from spreading COVID-19 to detainees." (*Id.* ¶ 32). "All HSIC employees are required to self-monitor for COVID-19 symptoms at the start of every shift," "report any possible symptoms to an immediate supervisor," and "wear surgical masks in the clinic."

(*Id.* ¶¶ 29, 30). "CoreCivic and ICE staff are to stay home if they are sick, experiencing any symptoms of COVID-19, or have been in close contact with someone exposed to COVID-19." (*Id.* ¶ 33). "Prescreening is being done of all staff, visitors and vendors prior to entrance to OMDC, including temperature checks . . . ." (*Id.* ¶ 31).

"OMDC IHSC medical staff provides education on COVID-19 to detainees and OMDC staff to include the importance of hand washing and hand hygiene, covering coughs with the elbow instead of the hands, and requesting to seek medical care if they feel ill." (*Id.* ¶ 21). "Information regarding COVID-19 medical status within OMDC is provided at Town Hall meetings in each Pod by IHSC twice a week." (*Id.* ¶ 25). "Detainees are regularly advised of the importance of wearing facial masks and social distancing during weekly Town Hall meetings, every day interactions with staff, and housing pod postings." (LaRose Decl., ECF No. 7-1 ¶ 46). "Detainees are verbally instructed as to their ability to obtain replacement facial masks during everyday interaction with staff, during town hall meetings, and during mask distributions." (*Id.* ¶ 77).

"The care of detainees at OMDC includes medical care for both male and female detainees, daily access to sick calls in a clinical setting, onsite medical housing units, mental health and dental health services, and the ability to transfer detainees to community hospitals or other community resources for mental or medical health care needs." (Malachova Decl., ECF No. 7-4 ¶ 9). "Medication distribution and Sick Call assessments, provider Sick Call, and Chronic Care assessments take place in cohort/quarantine pods . . . with the exception of IHSC medical staff determining that further assessment/care must be performed in the Medical Unit . . . . IHSC medical staff also conduct daily rounds to the housing pods to check on patients, collect Sick Call requests, and respond to urgent health care requests/needs." (LaRose Decl., ECF No. 7-2 ¶ 64).

"Any detainee having symptoms of COVID-19 is . . . referred to a medical provider for further evaluation." (Malachova Decl., ECF No. 7-4 ¶ 14). "The provider's analysis from the detainee's evaluation will determine what testing the detainee will undergo." (*Id.*). "Depending on the severity of the symptoms, the detainee may stay in [their unit] pending

outcome of testing or may be relocated to the Medical Unit for observation/care. Symptomatic detainees are not automatically relocated to a different housing location so as not to expose detainees who are ultimately negative for COVID-19 infection, to detainees who are already positive for COVID-19 or who may ultimately test positive for COVID-19." (LaRose Decl., ECF No. 7-2 ¶ 60). "If a detainee is subject to testing as determined by IHSC, the detainee's housing unit is placed on cohort/quarantine status, pending results of the testing for the suspected detainee. Quarantine may be discontinued following a 14-day period with no new cases, following the last positive test result." (*Id.* ¶ 61; *see* Malachova Decl., ECF No. 7-4 ¶ 15).

"In the event that a detainee at OMDC is diagnosed with COVID-19, IHSC will perform a medical assessment to determine the detainee's degree of illness." (Malachova Decl., ECF No. 7-4 ¶ 15). Detainees who have tested positive for COVID-19 may be housed individually in the MHU or in a cohort in the MHU, the K Pod, or the L Pod, depending on the degree of illness. "The MHU at the OMDC contains 14 single rooms, including six negative pressure rooms (airborne infection isolation rooms)." (*Id.*). "Low custody ICE detainees who are COVID-19 positive are assigned to K Pod." (LaRose Decl., ECF No. 7-2 ¶ 16). As of May 14, 2020, the K Pod was "at 40% capacity." (*Id.* ¶ 32). "Staff who enter housing locations with COVID-19-positive [detainees] are required to wear appropriate PPE, including N-95 respirators, eye protection, gloves, and gowns/coveralls." (*Id.* ¶ 63).

"IHSC will provide medical care to detainees who are diagnosed with COVID-19 to the point that it determines a detainee requires hospital care." (Malachova Decl., ECF No. 7-4 ¶ 15). "Medical care is provided by IHSC staff 24 hours a day, seven days a week." (*Id.* ¶ 22). The medical clinic at the OMDC includes a full time physician (internal medicine specialist), nurses, radiology technicians, records technicians, pharmacists, and pharmacy technicians . . . . The medical clinic has . . . the capability of conducting its own x-ray examinations for COVID-19-related pneumonia. The medical clinic . . . is [ ] capable of dispensing needed medications." (*Id.* ¶ 78). "In case of any clinical deterioration,

[detainees] will be referred to a local hospital." (Decl. of Kelley Beckhelm ("Beckhelm Decl."), ECF No. 7-3 ¶ 13).

"COVID-19 positive and exposed detainees may participate in recreation activities but may not intermix with general population detainees that have not been tested." (LaRose Decl., ECF No. 7-2 ¶ 83). A positive COVID-19 detainee can be released from isolation when "the detainee is 14 days past their first onset of symptoms and they have been symptom-free for three days." (Malachova Decl., ECF No. 7-4 ¶ 16). "A housing location that is used strictly for housing COVID-19 positive detainees may be released from cohort once all the detainees in that location have recovered and returned to general population, and no newly positive detainees are housed in that unit." (LaRose Decl., ECF No. 2 ¶ 62).

"New admissions to OMDC have been significantly limited since approximately April 2, 2020, except for a few cases where there was a critical need." (Beckhelm Decl., ECF No. 7-3 ¶ 12). New admissions and transfers to OMDC are screened by IHSC. "[D]etainees who present symptoms of COVID-19 will be placed in isolation, where they will be tested." (*Id.* ¶ 13; *see* Malachova Decl., ECF No. 7-4 ¶ 13). "If testing is positive, they will remain isolated and treated." (Beckhelm Decl., ECF No. 7-3 ¶ 13). New admissions and transfers without symptoms but with known exposure to COVID-19 "are placed in cohorts with restricted movement" and "monitored daily for fever and symptoms of respiratory illness." (*Id.* ¶ 14; Malachova Decl., ECF No. 7-4 ¶ 13).

Detainees continue to be released from OMDC. ICE "continue[s] to process removals and releases via parole or posting of bond" and "requests . . . for other forms of release." (Beckhelm Decl., ECF No. 7-3 ¶¶ 20, 26). "ICE has conducted multiple reviews to identify detainees who are 'at higher risk for severe illness' . . . to determine whether release is appropriate" pursuant to "the nationwide preliminary injunction in *Fraihat v. ICE*, --F. Supp. 3d.--, 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020)," "this Court's April 30, 2020 Temporary Restraining Order," and CDC and ICE guidelines. (*Id.* ¶¶ 19, 24, 25). As of May 15, 2020, eighty-six high-risk detainees had been released. IHSC continues to notify ICE "of [ ] detainee[s] who may potentially be at higher risk for serious illness from

exposure to COVID-19," and Enforcement and Removal Operations continues to "conduct [ ] custody review[s] to determine whether release is appropriate." (*Id.* ¶ 25). "Detainees are not released until they are medically cleared by IHSC." (*Id.* ¶ 28).

"Since the onset of reports of . . . [ ]COVID-19[ ], ICE epidemiologists have been tracking the outbreak, regularly updating infection prevention and control protocols, and issuing guidance to field staff on screening and management of potential exposure among detainees." (*Id.* ¶ 7). "As of May 14, 2020, a total of 153 ICE detainees at OMDC had tested positive for COVID-19," and "[o]ver 100 . . . have recovered . . . ." (LaRose Decl., ECF No. 7-2 ¶ 11). "[T]he number of ICE detainees testing positive for COVID-19 on a daily basis has significantly declined since May 5, 2020 . . . [and] [t]he number of recoveries is [ ] significantly increasing . . . ." (*Id.* ¶ 12).

## III. CONTENTIONS

Petitioner asserts that his continued detention during the COVID-19 pandemic violates his substantive due process rights under the Fifth Amendment of the United States Constitution. Petitioner contends that OMDC has "failed to allow for important [ ] measures" to prevent and combat the spread of COVID-19. (ECF No. 1 ¶ 31). Petitioner contends that he "lack[s] access to basic hygienic cleaning materials and personal protective gear." (*Id.* ¶ 4). Petitioner contends there are too many detainees at OMDC for Petitioner "to be able to maintain proper social distancing or sanitation practices," and OMDC staff fail to enforce social distancing measures. (*Id.* ¶¶ 41, 43).

Petitioner further contends that he suffers from medical conditions that place him at a high risk of suffering complications or death from COVID-19. Petitioner contends that he has been diagnosed as "pre-diabetic," and his diet and OMDC "has caused him to gain over 20 lbs." (*Id.* ¶¶ 5, 69). Petitioner contends that "he experiences severe asthmatic episodes—marked by difficulty breathing—whenever he gets sick . . . ." (*Id.* ¶ 72). Petitioner contends that he has not received adequate medical care to manage his underlying conditions or to treat his COVID-19 infection. Petitioner contends that the conditions at OMDC deprive Petitioner of his right to reasonable safety, constitute cruel

and unusual punishment, and violate the special relationship that the government assumes when it detains an individual. Petitioner further contends that "Respondents' interest in ensuring that Petitioner does not abscond or endanger the public could readily be achieved through less potentially deadly means . . . ." (*Id.* ¶ 100).

Respondents contend that Petitioner fails to show that the steps Respondents have taken to prevent and treat COVID-19 at OMDC are "objectively unreasonable." (ECF No. at 8). Respondents contend that Petitioner's medical records directly refute his allegations about his underlying medical conditions and the quality of medical care he is receiving at OMDC. Respondents contend that "[t]here is a strong governmental interest in assuring that Petitioner, who is an extreme flight risk, will be repatriated at the conclusion of his removal proceedings." (*Id.* at 11).

## IV. DISCUSSION

To succeed on a habeas petition, a petitioner must show that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3).

### a. Relation to a Legitimate Government Purpose

Individuals detained pursuant to immigration violations are civil detainees. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). "[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). The government violates the Due Process Clause when a civil detainee is "subjected to conditions that 'amount to punishment.'" *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) (quoting *Bell*, 441 U.S. at 536). A petitioner can demonstrate punitive conditions by showing that the challenged condition is: (1) expressly intended to punish; (2) not rationally related to a legitimate government objective; or (3) excessive in relation to a legitimate government objective. *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015); *see also Jones*, 393 F.3d at 933-34 (holding that conditions are punitive where they are "employed to achieve objectives that could be

accomplished in so many alternative and less harsh methods" (citation and quotation marks omitted)).

In this case, Petitioner asserts that his continued detention under the current conditions[1] at OMDC is excessive in relation to government's interests in preventing detainees from absconding and preventing harm to the public. The Supreme Court has recognized that the detention of individuals pending their removal proceedings is rationally related to the legitimate governmental interest of ensuring their appearance for their deportation proceedings and preventing danger to the community. *See Zadvydas*, 533 U.S. at 690. "[D]etention during deportation proceedings [is] a constitutionally valid aspect of the deportation process." *Demore v. Kim*, 538 U.S. 510, 523 (2003); *see Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018) ("Detention during [immigration] proceedings gives immigration officials time to determine an alien's status without running the risk of the alien's either absconding or engaging in criminal activity before a final decision can be made.).

Petitioner has been removed from the United States seven times since April 2008. The evidence submitted by Petitioner indicates that he has a criminal conviction for battery. (*See* Appl. for Discretionary Release, Ex. A, Tschirgi Decl., ECF No. 1-4 at 4 (Petitioner "has one traffic violation from 2016 and a January 16, 2019 conviction for CA PC § 242 (simple battery). On the battery charge, he was sentenced to complete 52 weeks of domestic

---

[1] The Supreme Court has not foreclosed the use of habeas corpus for conditions of confinement claims. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862 (2017) (leaving open the question of whether alien detainees challenging "large-scale policy decisions concerning the conditions of confinement imposed . . . might be able to challenge their confinement conditions via a petition for a writ of habeas corpus"); *Boumediene v. Bush*, 553 U.S. 723, 792 (2008) (declining to determine "the reach of the writ with respect to claims of unlawful conditions of treatment or confinement"); *Bell*, 441 U.S. at 526 n. 6 (leaving for "another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement"). Because Petitioner claims that his continued detention under the present conditions is unconstitutional, Petitioner can be viewed as challenging the fact of his confinement. *See Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973) (explaining that where an individual is "challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release," the proper remedy is a writ of habeas corpus).

violence classes . . .")). ICE denied Petitioner's Application for Discretionary Release, stating, "[Petitioner] has demonstrated a flagrant disregard for U.S. Immigration laws and is considered a significant flight risk . . . . There is no appeal from this decision." (May 29 Denial Letter, ECF No. 7-1 at 39). Petitioner has an upcoming hearing with an immigration judge on July 10, 2020. Respondents have taken substantial steps to respond to the COVID-19 outbreak. OMDC is operating at about half capacity. Practices have been implemented to promote the maintenance of six feet of physical distance among detainees and staff at OMDC. Detainees are offered masks, gloves, cleaning supplies, and disinfectants and encouraged to use them. Detainees who test positive for COVID-19 are segregated from the general detainee population and have 24/7 access to medical care. Respondents' data show that their responsive measures have been effective at reducing the spread of COVID-19. Petitioner has experienced symptoms of COVID-19 and has received daily medical monitoring and treatment. Petitioner has not demonstrated that his continued detention under the current conditions at OMDC is excessive in relation to the government's legitimate objective.

### b. **Reasonable Safety and Medical Care**

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989); *see Henry A. v. Willden*, 678 F.3d 991, 998 (9th Cir. 2012) (when the government takes custody of a person, it creates a "special relationship" wherein the Government assumes responsibility for that person's safety and well-being (citation omitted)). The government violates the Due Process Clause if it fails to provide civil detainees with "basic human needs," including "food, clothing, shelter, medical care, and reasonable safety." *DeShaney*, 489 U.S. at 200.

The Court of Appeals for the Ninth Circuit analyzes constitutional claims based on a failure to provide for basic human needs under an objective deliberate indifference standard. *See Castro v. Cty. of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc)

(adopting objective deliberate indifference standard to evaluate failure to protect claim by pretrial detainee); *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018) (applying the standard articulated in *Castro* to pretrial detainee's claim that jail violated right to adequate medical care, explaining that "logic dictates extending the objective deliberative indifference standard articulated in *Castro* to medical care claims"), *cert. denied*, *Cty. of Orange v. Gordon*, 139 S. Ct. 794, 2019 U.S. LEXIS 345 (U.S. Jan. 7, 2019); *Smith v. Washington*, 781 F. App'x 595, 597-98 (9th Cir. 2019) (applying *Castro*'s objective deliberate indifference test to civil detainees' conditions of confinement claim alleging that state officials violated their constitutional rights by exposing them to tobacco smoke), *reh'g denied*, 2019 U.S. App. LEXIS 23060 (9th Cir. Aug. 1, 2019). Under the objective deliberate indifference standard, the petitioner must show:

> (1) [t]he defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) [t]hose conditions put the plaintiff at substantial risk of suffering serious harm;(3) [t]he defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (4) [b]y not taking such measures, the defendant caused the plaintiff's injuries.

*Castro*, 833 F.3d at 1071. "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[ ] on the facts and circumstances of each particular case.'" *Id.* (alteration in original) (quoting *Kingsley*, 135 S. Ct. at 2473).

The record in this case demonstrates that Respondents are aware of the risks posed by COVID-19 and have made intentional decisions to implement responsive measures, including segregating detainees by pods, isolating groups of COVID-19-positive detainees, providing personal protective equipment ("PPE"), releasing high-risk detainees and limiting the number of new detainees to lower the OMDC population, and educating detainees and staff on the importance of utilizing PPE, hand washing, and social distancing.

Respondents have not chosen to require detainees to wear masks or to individually quarantine every detainee who tests positive for COVID-19.

Petitioner does not assert, and the record does not support a claim, that Petitioner has any condition that the CDC has determined increases the risk of severe illness or death from COVID-19.[2] The record shows that Petitioner has adequate access to medical facilities. Petitioner has experienced symptoms of COVID-19, has been prescribed medication, and is receiving daily medical care. The record shows that OMDC has taken adequate steps to respond to the COVID-19 outbreak. Petitioner fails to provide evidence that the conditions at OMDC place him at a "substantial risk of suffering serious harm" or that the measures Respondents have taken to address the COVID-19 outbreak are "objectively unreasonable." *Id.* The Court concludes that Petitioner fails to demonstrate that his continued detention violates "the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3).

## V. CONCLUSION

IT IS HEREBY ORDERED that the Motion for Temporary Restraining Order filed by Petitioner Jose Manuel Arizmendi de Paz (ECF No. 3) is denied.

IT IS FURTHER ORDERED that the Motions to File Documents Under Seal filed by Respondents (ECF Nos. 5, 13) are granted.

IT IS FURTHER ORDERED that the Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 filed by Petitioner Jose Manuel Arizmendi de Paz (ECF No. 1) is

---

[2] On April 30, 2020, the Court granted a motion for a subclass-wide temporary restraining order in *Alcantara v. Archambeault, et al.*, No. 3:20-cv-00756-DMS-AHG (S.D. Cal.). The Court provisionally certified a class of "[a]ll civil immigration detainees incarcerated at the Otay Mesa Detention Center who are age 60 or over or who have medical conditions that place them at heightened risk of severe illness or death from COVID-19 as determined by CDC guidelines," and ordered the respondents to release members of the subclass from detention pursuant to certain conditions. *Alcantara*, No. 3:20-cv-00756-DMS-AHG, ECF No. 38 at 2-3. Petitioner does not assert that he is a member of the subclass provisionally certified in *Alcantara*.

dismissed. The Clerk of the Court shall enter judgment in favor of Respondents and against Petitioner.

Dated: June 25, 2020

Hon. William Q. Hayes
United States District Court